# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF GEORGIA

## SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No.  CR408-085 |
| | ) | |
| FRANK B. VURGESS, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Frank Vurgess has moved to suppress the firearms which form the basis of the two-count indictment charging him with unlawful possession of firearms as a convicted felon.  (Doc. 11.) These weapons were seized by Savannah police officers during two warrantless searches of Vurgess' residence.  After conducting an evidentiary hearing, the Court finds that the assault rifle seized during the September 3, 2007 search must be suppressed, as this initial search was conducted pursuant to a police policy that requires officers who encounter a residence with an open door to

enter and inspect that residence (where they receive no response to their knock at that door), despite the absence of probable cause or exigent circumstances. Such a warrantless intrusion into the historic zone of privacy associated with a personal residence simply cannot be squared with Fourth Amendment doctrine. The subsequent entry and search of the residence on October 3, 2007, however, did not offend the Fourth Amendment and was sufficiently independent of the initial illegality. The pistols discovered by the officers on that occasion are therefore not subject to suppression.

## I.    FACTS

The initial search of Vurgess' residence occurred on September 3, 2007, when Savannah police officer Michael Dantzler was dispatched to 807 East 31st Street to investigate a citizen complaint that dogs were being abused and bred to fight on that property. Upon arriving at the residence at around 3:00 p.m., Officer Dantzler noticed that many of its windows were boarded up and that someone had scrawled a message on the unboarded

window facing the street.[1]  In the unkempt yard behind the house, the officer observed some pit bull puppies housed in makeshift kennels.  The dogs appeared to be healthy and were supplied with food and water.  Observing no signs of abuse, Officer Dantzler elected not to call animal control to the scene.

After determining that the dogs were well cared for, Officer Dantzler approached the front door of the residence with the intention of speaking with the occupant.  Although the boarded up windows were characteristic of an abandoned house, Dantzler had not ruled out the possibility that someone was living there, and he made no determination that the house was abandoned.  Dantzler opened the screen door at the front of the residence for the purpose of knocking on the main entrance door and making his presence known.  When he opened the screen door, he discovered that the main door was slightly ajar by some six to twelve inches.  Dantzler proceeded to knock on the latter door but received no response to either his knocks or his verbal requests for someone to come to the

---

[1] The message read:  "We love u mama.  R.I.P."  Although Officer Dantzler testified at one point that the home "had graffiti all over it," the photographs of the residence offered into evidence by the government reflected no other "graffiti" than this simple message.  (Gov't Exs. 1-5.)

door.  While standing outside the residence, Officer Dantzler could see through the slightly open door what appeared to be some clothes lying on the floor.  Dantzler testified that during his recent police training he had been taught that whenever officers encounter a residence with an open door and receive no response from inside the residence, they are to enter the residence and inspect each of its rooms in order to determine if anything is amiss.[2]  Acting pursuant to that policy, he and a backup officer summoned to the scene proceeded to enter the residence with their guns drawn.  Using their flashlights because it was dark inside, the officers walked through the house room by room, opening any closet doors as they went.  Inside the last room they entered, the officers observed an "assault rifle" leaning up against a dresser. Located on the floor of this room were a mattress and boxspring. Next to this bed was a laptop computer and some other electronic equipment connected by a mass of wires.  Dantzler "secured" the weapon and removed it from the residence with the intention of logging it in for safekeeping.

---

[2] Officer Dantzler testified that this unwritten departmental policy applies whether the residence appears to be occupied or abandoned.

Dantzler exited the home and was completing some paperwork when a twelve-year-old boy approached and identified himself as the owner of the dogs. A few minutes later, three black females drove up to the residence and informed the officer that the residence had been owned by their grandmother, who had passed away some time ago. Officer Dantzler showed them the assault rifle he had removed from the residence and asked if they wanted to take possession of the weapon. They disclaimed any knowledge of the rifle and indicated that the officer could have it destroyed. Dantzler prepared a brief hand-written incident report and logged the rifle into the police property room for safekeeping. (Doc. 12, Ex. A at 6; Def.'s Ex. 1.)

Unbeknownst to Officer Dantzler at the time of his visit, the property located at 807 E. 31st Street had been the subject of numerous prior complaints by the next door neighbor, Mr. Scott West, who was most unhappy with the way the property was being maintained and utilized by its owners. (See Doc. 12, Ex. A at 12 (reflecting that the police had been called to the property 17 times during the 5-year period preceding Dantzler's visit).) Nor did

Dantzler's visit to the property on September 3, 2007 resolve the issues that concerned the next door neighbor, for on September 6 West wrote a lengthy e-mail setting out in some detail his numerous concerns about the property and the inadequate police response to those concerns. (Gov't Ex. 13.) The next day West sent a second e-mail that restated his concerns. (Gov't Ex. 14.) These e-mails, which referenced another "Michael Vick in Savannah," complained that the residence had a "10-year + history of being a haven for drug[s], dogfighting, and animal abuse." (Gov't Ex. 13.) The e-mails referenced pit bulls being kept in illegal kennels, noise violations, building code violations, property maintenance issues, gunfire, fighting, drug trafficking, and gang-related activity on the property. West forwarded his e-mails to numerous police officials, the city manager, various aldermen, all three Savannah TV stations, and the local newspaper. (Doc. 12, Ex. A at 13-18; Gov't Ex. 14.) These rather remarkable e-mails[3] were soon forwarded to Star Corporal Tony Lopez, a community affairs officer charged

---

[3] The officer who forwarded the second e-mail to Cpl. Lopez indicated that he "had never heard of anything like this in my life." (Gov't Ex. 14.)

with responding to citizen complaints that might require coordination of various police and city officials. The e-mails reflected that West had been complaining to the police for years to no avail and said that he had been threatened both by the owners of the property and by a police officer who had responded to an incident at the property a year earlier. Lopez received these e-mails on September 6 and 7, 2007.

Because of the unusual nature of the e-mails, Lopez immediately arranged a meeting involving various supervisory officials with the city's animal control unit, its property maintenance division, and the police department to discuss options for addressing the "multi-faceted" problems raised by Mr. West.[4] On September 7, 2007, the assembled team went to 807 E. 31st Street to inspect the property and take appropriate action. As the photos taken by Lopez confirm, the home and yard were in the same condition encountered by Officer Dantzler a few days earlier. (Gov't Ex. 1-5.) Although no one responded to knocks at the door,

---

[4] In preparing for this meeting, Cpl. Lopez reviewed a record of all prior police calls to the residence over the last several years, which alerted him to the fact that a weapon had recently been removed from the residence.

no officer or city official entered the property on this occasion. After finding that the puppies located in the backyard had no food or water, animal control officials removed the dogs from the property. A supervisor with the city's property maintenance division also assessed the residence and concluded that it would be necessary to board up the front door "if" it was determined to be abandoned. Vurgess, however, came to the house later on and indicated that he was in the process of repairing the property. Accordingly, the property maintenance officials elected not to board up the residence's only entrance door.

Later that day, Cpl. Lopez spoke by telephone with Vurgess and told him why the animal control officers had removed the dogs from the property and advised him that he would be charged with animal neglect. During the course of this conversation, Vurgess indicated that he was staying at 643 E. 31st Street and that he intended to renovate 807 E. 31st Street. At no time during this initial conversation was there any mention of the gun found by Officer Dantzler on September 3, 2007.

On September 19, 2007, Cpl. Lopez again made telephone contact with Vurgess to remind him of the impending court date regarding the dog neglect charge and to inquire about the rifle that had been found in the residence. Vurgess admitted that he had "handled" the rifle and volunteered that some other firearms that had belonged to his deceased parents were inside the residence. Vurgess stated that he and his sister were now the legal owners of the property.

Sometime between September 18 and October 3, 2007, Cpl. Lopez learned that Vurgess was on state probation. On October 3, Lopez telephoned Vurgess' probation officer, Brenda Caviness, and informed her that Vurgess had admitted handling the rifle recovered from the property, acknowledged that there were other weapons in the house, and indicated that he was staying at another residence located a few blocks down the street from 807 E. 31st Street.[5]

---

[5] Lopez acknowledged that he had received some information that Vurgess was in fact living at 807 E. 31st Street. It is clear that Lopez was simply relaying what Vurgess had told him and that Lopez had no clear idea where Vurgess was actually residing. At the hearing, Lopez indicated that his primary focus remained the dog problem, not the guns or the address issues.

Probation Officer Caviness began supervising Vurgess just after his release from the Chatham County Jail in May 2007. Vurgess listed his address as 807 E. 31st Street and was instructed not to change his place of abode without the prior permission of his probation officer. On September 24, 2007, Caviness received a voicemail message from a police officer indicating that "there was some sort of situation going on with Vurgess" and that Cpl. Lopez was handling the matter. The voicemail, which was somewhat garbled, indicated that Vurgess might not be living at the address he had furnished to probation and stated that a weapon had been taken from the property and some additional weapons might be stored there. Following up on her "primary concern" that Vurgess had moved without giving notice to the probation office, Caviness drove by the 807 residence and developed a "first glance" impression that the house was not inhabited, although she readily acknowledged that she had seen people residing "in much worse places." Although a Fourth Amendment waiver had been imposed as part of Vurgess' sentence, Caviness was reluctant to enter the

residence without better information that Vurgess was actually residing there.

After speaking with Cpl. Lopez on October 3, 2007, Caviness and another probation officer went to 643 E. 31st Street to verify whether Vurgess in fact living at that address. The black male who answered the door explained that he had "kicked Mr. Vurgess out" approximately a week earlier. He allowed Caviness to examine the room that Vurgess had occupied and furnished her with a "Sam's card" that Vurgess had left behind. That card was registered to Sam's Warehouse customer Bryan Thomas. Retaining the card in her possession, Caviness then went to 807 E. 31st Street, where she observed a green Isuzu Trooper parked sideways in the driveway. After receiving no response to her knocks on the door and taps on the window of the residence, Caviness left her business card affixed to the screen door. She then peered inside the Isuzu and observed a beverage cup that still contained ice and was covered with condensation. Suspicious that the vehicle occupant was inside the residence, Caviness called Cpl. Lopez and had him run a computer check on the vehicle's tag. She soon learned that the vehicle had

been reported stolen by its registered owner, Mr. Bryan Thomas, whose name also appeared on the Sam's card that Caviness had just recovered.

What had begun as a "simple address verification"[6] by Caviness had now developed into a stolen vehicle case implicating Mr. Vurgess. Caviness enlisted the assistance of Lopez and other police officers, and while awaiting their arrival she learned from neighbors that the driver of the Isuzu, a black male, had entered the residence and had not come out. Once the police officers responded to the scene, one of the officers reached his hand through a small broken glass pane in the front door, unlocked the door, and entered the residence. Vurgess immediately surrendered. A search of the residence uncovered the two pistols that Vurgess is charged with possessing under Count Two of the indictment.

At the suppression hearing, Vurgess testified that he had listed 807 E. 31st Street as his address with the probation officer and had every intention of residing at his mother's former home

---

[6] Caviness testified that the sole reason that she went to 643 E. 31st Street, and thence to 807 E. 31st Street, was to determine where Vurgess was actually residing.

upon his release from custody. Vurgess stated that he kept his clothes and all his possessions at that residence, took baths there, slept there, and "lived" there. He acknowledged that he sometimes stayed at 643 E. 31st Street following his release but indicated that he never moved his personal belongings out of 807 E. 31st Street. He testified that he had spent money trying to improve the condition of the house and felt he had the right to exclude other people from that property. On cross-examination, he disclaimed ownership of a stolen laptop computer found in the residence, explaining that while he was incarcerated other people had had access to the house. He admitted telling Cpl. Lopez that he was "staying" at 643 E. 31st Street but claimed that he never stopped "living" at the 807 address.

## II.  ANALYSIS

Vurgess contends that the initial warrantless search of 807 E. 31st Street violated his Fourth Amendment right to be free from unreasonable searches and seizures, as the government has shown no exigency or other justification for intruding into his private

premises without first securing a warrant. Vurgess contends that the second search of the residence on October 3, 2007 is "tainted by the illegality of the original search," and therefore cannot be justified by the fact that he had executed a waiver of his Fourth Amendment rights as a condition of his state probation.[7] (Doc. 11 at 8.) Vurgess thus argues that the exclusionary rule requires suppression of both the assault rifle found during the first search and the "derivative" evidence found during the later search.

The government's response to Vurgess' attack on the first search presents somewhat of a moving target. Initially, the government argued that Officer Dantzler's entry into the residence was "based on probable cause." (Doc. 12 at 1.) The government abandoned its probable cause argument at the evidentiary hearing after Officer Dantzler testified that he had no basis whatsoever for suspecting "that there was some crime occurring at this property." (Tr. 46.) The government next argues that even though Vurgess has standing to challenge the search of 807 E. 31st Street, (doc. 21

---

[7] The superior court imposed such a condition when it sentenced Vurgess for a drug charge on September 22, 2005. (Gov't Ex. 16.) The government has never contended that this Fourth Amendment waiver served as a basis for the *initial* search conducted on September 3, 2007, (Doc. 12 at 5 n.3), although it does rely on the waiver with respect to the second search.

at 3), his privacy expectations in that property were "greatly diminished" and were "not equivalent to what would normally be expected of a private residence." (Doc. 21 at 3; doc. 12 at 7.) In support of this argument, the government asserts that Vurgess was not residing at 801 E. 31st Street when Officer Dantzler entered the property; he made only "minimal efforts" to secure the property, as the front door was left unlocked and open; and the house was "dilapidated." (Doc. 12 at 2, 5-7; doc. 21 at 3, 5.) Finally, the government invokes the "community caretaking" exception recognized in Cady v. Dombrowski, 413 U.S. 433 (1973), arguing that Officer Dantzler's warrantless entry was necessitated by the need to secure the house and the safety of the community. (Doc. 12 at 10-12; Doc. 21 at 3-8.)

After considering the evidence and the parties' briefs, the Court is satisfied that the government has not met its burden of establishing that the initial search of Vurgess' residence was justified under any recognized exception to the Fourth Amendment warrant requirement. The evidence pertaining to the assault rifle seized during that search must therefore be suppressed. The

Court, however, rejects Vurgess' argument that the evidence seized during the later search of his residence constituted the tainted fruit of the initial illegality. Because there was an independent and constitutionally valid reason for the later entry of the residence, Vurgess has shown no basis for suppressing the pistols discovered during that warrantless search.

## A. The Initial Search

The Fourth Amendment protection against unreasonable searches and seizures applies with special force to "the sanctity of a man's home," Boyd v. United States, 116 U.S. 616, 630 (1886), which is "ordinarily afforded the most stringent Fourth Amendment protection." United States v. Martinez-Fuerte, 428 U.S. 543, 561 (1976). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. United States Dist. Court, 407 U.S. 297, 313 (1972). "It is thus a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980).

The Fourth Amendment prohibits only "unreasonable" searches and seizures. U.S. Const. amend. IV. Such an "amorphous" constitutional standard, id. at 600, generally does not permit the drawing of bright lines. But the entranceway to a home is an exception to the judiciary's reluctance to engage in line-drawing when applying the Fourth Amendment. Kyllo v. United States, 533 U.S. 27, 40 (2001) (Scalia, J.). Again and again, the Supreme Court has made clear that the societal interest in preserving the privacy and sanctity of the home requires that the physical dimensions of a residence receive special constitutional status.

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 [(1961)]. In terms that apply equally to seizures of property and to seizures of persons, *the Fourth Amendment has drawn a firm line at the entrance to the*

> *house*.   Absent exigent circumstances, that threshold
> may not reasonably be crossed without a warrant.

Payton, 445 U.S. at 589-90 (emphasis added).[8]   The "firm line"

drawn by Payton at the threshold of the home has been "re-inked"

by subsequent Supreme Court and Eleventh Circuit cases.   McClish

v. Nugent, 483 F.3d 1231, 1242-43 (11th Cir. 2007) (citing

numerous cases applying the firm "constitutional line" drawn at

the entrance to the house).   Indeed, as Justice Scalia has

emphasized, the line which demarks the boundary of the house

"must be not only firm but also bright."   Kyllo, 533 U.S. at 40.

Thus, "any physical invasion of the home, 'by even a fraction of an

inch,' [is] too much."   Id. at 37 (quoting Silverman, 365 U.S. at

512).

The physical boundary of the home has such special

constitutional significance that not only are the police precluded

from using a crowbar to break down the door (as officers did in

---

[8] This prohibition against warrantless intrusions into the home applies "even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." Payton, 445 U.S. at 588. Indeed, "'no amount of probable cause'" will justify an intrusion into the privacy of a home without a showing of exigent circumstances. Horton v. California, 496 U.S. 128, 137 n.7 (1990).

Payton, 445 U.S. at 583), they may not even reach an arm through an *open* doorway in order to effect the warrantless arrest of a felony suspect standing just inside the threshold of his home. McClish, 483 F.3d at 1248. The "constitutional line" surrounding a home[9] simply cannot be crossed by government agents lacking a warrant "absent an exigency or consent." Id. at 1242. Furthermore, any officer who intrudes into a home without a warrant "bears the burden of proving that his conduct was justified." Id. at 1241.

While the government does not directly address these principles in its brief, it implicitly recognizes their significance by its assiduous efforts to take this case outside the full reach of the Fourth Amendment's special protection for the home. By conceding Vurgess' "standing" to assert the Fourth Amendment, (doc. 12 at 3), the government necessarily recognizes that he had a

---

[9] While it is sometimes said that the Fourth Amendment "protects people, not places," Katz v. United States, 389 U.S. 347, 351 (1967), physical property boundaries still have relevance to the Fourth Amendment analysis. McClish, 483 F.3d at 1242 n.12; see United States v. Jackson, 588 F.2d 1046, 1052 (5th Cir. 1979). By drawing a firm, bright line at the threshold of the home, the Supreme Court has made very clear that the home is one "place" that *is* deserving of special protection under the Fourth Amendment. See Georgia v. Randolph, 547 U.S. 103, 126 (2006) ("The home is entitled to special protection as the center of the private lives of our people."); Kyllo, 533 U.S. at 37-40.

legitimate expectation of privacy in the residence that is deserving of constitutional protection. But the government argues that Vurgess' expectation of privacy was "greatly diminished" by the poor condition of the property, the fact that he did not "live" there, and his failure to secure and lock the front door to the residence. (Doc. 21 at 3.) The Court is not persuaded by any of these arguments.

The government repeatedly refers to the "dilapidated" condition of the home, noting that many of its windows were boarded up, there was "graffiti" on the front window glass, and there was debris in the yard. The poor condition of a structure used as a home, however, is of no constitutional significance. It is an old concept, well familiar to the drafters of the Fourth Amendment, that

> "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter -- all his force dares not cross the threshold of the ruined tenement!"

Payton, 445 U.S. at 601 n.54 (citation omitted) (quoting the 1763 speech of William Pitt, Earl of Chatham, in the House of

Commons).  This famous speech, which "echoed and re-echoed throughout the Colonies," id., reflects "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic."  Id. at 601.  The Fourth Amendment, like the common law, regards every man's home as "his castle," id. at 596, 597-98; McClish, 483 F.3d at 1239, and thus provides equal protection to the mansion and to the hovel.

Although the dilapidated condition of the home is of no constitutional significance, the government argues that the "general state of disrepair" of the property suggested to Officer Dantzler that the house "may be abandoned."  (Doc. 21 at 2.)  Officer Dantzler, however, testified that he never came to the conclusion that the house was an "abandoned" property.[10]  (Tr. 25-26, 38-40.)  Nor was the house in such poor condition that it was reasonable for an officer to conclude that it could no longer serve as a dwelling place or that it lacked any conceivable privacy attributes

---

[10] Officer Dantzler defined an "abandoned" house as "property that is unlivable," "condemned property," or a home whose "walls [are] falling down." (Tr. 39.)  While the house located at 807 E. 31st Street was certainly not in pristine condition, it had a well-shingled roof, sturdy walls, and was not open to the elements.  Officer Dantzler never ruled out the possibility that someone was actually living there.

deserving of constitutional protection (such as might be true in the case of a collapsed structure that has been left to nature, or a home in the process of demolition). Furthermore, government officials must be careful before intruding into a home simply because they consider it to be unlivable. For example, even a house that has been ravaged by fire is deserving of Fourth Amendment protection and, absent some exigency, cannot be searched without a warrant. United States v. Parr, 716 F.2d 796, 810 (11th Cir. 1983) (once the fire is out and no exigency is present, fire officials cannot conduct a warrantless search of a house pursuant to some "general practice of salvaging valuables, ostensibly for the protection of the owner of the burned house."). Because of "the substantial privacy interests implicated by any entry into a person's home by a governmental official," id. at 812, a police officer should not cross the threshold of even a "ruined tenement" without a compelling reason. So, the poor condition of the residence offers no justification for the officer's entry. [11]

---

[11] Rather than indicating a diminished expectation of privacy, the boarding up of a home's windows can just as readily be interpreted as an

In order to receive the special protection accorded to "houses" under the Fourth Amendment, it must be established that the structure -- be it a traditional house or a tent -- "harbors those intimate activities associated with domestic life and the privacies of the home." United States v. Dunn, 480 U.S. 294, 301 (1987) (defining the "curtilage" of a house). Thus, even a structure specifically designed for use as a dwelling is not entitled to the special constitutional protections reserved for "houses" if it is clear that the structure is not in fact being utilized as a home. See United States v. Barajas-Avalos, 377 F.3d 1040, 1057 (9th Cir. 2004) (travel trailer used to manufacture methamphetamine did not qualify as a "home," as agents observed no signs of residency during multiple surveillances, neighbors said no one lived there, and there was no evidence of occupancy (such as electricity, running water, clothing, bedding, food, a TV set or radio, or other personal effects)).[12]   In the present case, the evidence establishes

---

extreme measure to safeguard the home from onlookers and trespassers, thereby preserving its sanctity and privacy.

[12]   The issue in Barajas-Avalos was whether the area immediately surrounding the travel trailer constituted the "curtilage" of a home, thus requiring the suppression of the evidence observed when the agents peered

that Vurgess used 807 E. 31st Street for domestic purposes, as he maintained a bed and entertainment equipment there, kept his clothing and other personal items (including guns) there, bathed there, and sometimes slept there. While this address was certainly not his exclusive residence, full-time occupancy is not required in order to qualify a structure as a "house" under the Fourth Amendment. Furthermore, even if the residence was not entitled to the "special protections" accorded to a home, it was nevertheless entitled to traditional Fourth Amendment protection: absent consent or some exigency, an officer could no more invade the privacy of this structure than he could the trunk of a lawfully-parked car.

This is not to say that some homeowners cannot have a greater or lesser expectation of privacy than others, because of either the nature of the home's construction or the manner in which they treat their residence. A home built as a fortress and surrounded by a security perimeter patrolled by guards is obviously

through the window of the trailer (and examined other nearby structures). 377 F.3d at 1052-53, 1057. Although the agents never entered the trailer, the defendant argued that the agents violated the special protection accorded to houses when they trespassed into the curtilage of his "home."

more secure, and in a sense more "private," than is a thin-walled shack located along a public thoroughfare. But as to neither property can a law enforcement officer conduct a warrantless search without the resident's consent or some exigency requiring urgent action. Of course, even the owner of the most secure and well-built home cannot have a legitimate expectation of privacy in what he knowingly exposes to public view. <u>Katz</u>, 389 U.S. at 351-52. Thus, even as to identical houses located along the same street, the owner who bolts his door and shutters his windows naturally possesses a greater expectation of privacy than the homeowner who leaves his door and windows open for public inspection. But the simple fact that some homes are better constructed or maintained than others, or that some homeowners take greater steps to protect their privacy, in no way diminishes the sanctity of the dwelling or affords an officer any greater right to thrust himself across the threshold of the home.

In furtherance of its lesser-expectation-of-privacy argument, the government continually hammers home the point that the front

door of the residence was left open.[13]  (Doc. 12 at 6 (noting that Vurgess "made minimal efforts to secure the property from public access, leaving the front door unlocked and open")); (doc. 21 at 2, 3.)  The testimony, however, establishes that while the main entrance door to the residence was left ajar by some six to twelve inches, that fact was not discernable to passersby.  Indeed, not until Officer Dantzler opened the screen door to the residence did he determine that the main entrance door was slightly open.  Moreover, an open front door -- even if that fact is visible from the street -- is not an invitation for a law enforcement officer to enter a home.  1 Wayne R. LaFave, Search and Seizure, § 2.3(b) at 565 (4th ed. 2004) (the Fourth Amendment protection against an unconsented police entry into a residence (or motel room or any dwelling place) "extends even to 'occupants of flimsily constructed dwellings with unobstructed windows or other openings directly on

---

[13] The government also points out that Vurgess "allowed others to enter to store items of property there."  (Doc. 21 at 3.)  While Vurgess conceded that others had access to the residence "while he was incarcerated," (id. at 2), he never testified that he "allowed" others to occupy his home at any time, and the fact remains that he was not incarcerated in September 2007 when Officer Dantzler searched the residence.  Furthermore, a homeowner does not generally surrender his Fourth Amendment protections by allowing others to access the residence or store their property there.

public lands, streets, or sidewalks, who failed to lock their doors to bar entrance.'"). Even answering a law enforcement officer's knock at the door is not an invitation for the officer to enter the residence. McClish, 483 F.3d at 1247 (noting that "'a person does not surrender his expectation of privacy nor consent to the officers' entry' by opening the door to a residence") (citation omitted); New Mexico v. Halpern, 30 P.3d 383, 387 (N.M. Ct. App. 2001) ("The sanctity of the home is not abandoned by simply leaving a door cracked."); State v. Sims, 523 S.E.2d 619, 627 (Ga. App. 1999) ("A garage and basement door left open to admit light and air does not constitute a blanket invitation to the police to enter" the home.).[14]

Finally, the government suggests that Vurgess had a lesser expectation of privacy because he was not in residence at 807 E. 31st Street on the particular date Officer Dantzler entered the

---

[14] An officer who encounters a door that appears to have been pried open (or other evidence reasonably suggesting that a home is being burglarized) may be justified in entering the dwelling for the purpose of aiding the owner or protecting his property. See 3 LaFave, Search and Seizure § 6.6(a), (b) (citing numerous cases). But the hallmark of such cases is genuine exigency, and where that is lacking, courts are not charitable to officers who trespass through the open door of a home. See United States v. Moss, 963 F.2d 673 (4th Cir. 1992); see also United States v. Selberg, 630 F.2d 1292 (8th Cir. 1980).

house but was staying at the 643 address at the time.[15] But the evidence suggests that Vurgess was utilizing both houses for residential purposes, engaging in some domestic activities at one residence and some at the other. (Doc. 21 at 2; doc. 12 at 1, 5-7). The government offers no authority for the rather remarkable proposition that one has to reside full time in a home in order to claim the protections of the Fourth Amendment for that property. That argument, if accepted, would mean that those individuals fortunate enough to own two homes could insist upon the full protections of the Fourth Amendment's "zone of privacy" only for the home where they were currently residing. But there is nothing about a second home or a summer cabin -- however infrequently used by its owner -- that results in a diminished expectation of privacy in the domestic life of that residence or the personal effects stored there. The Fourth Amendment protects "[t]he right of the people to be secure in their . . . *houses* . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV (emphasis

---

[15] The government does not make the argument that Vurgess had "*no*" expectation of privacy in the residence, only that his expectation of privacy was "diminished" due to the fact that he was not a permanent resident there. The government, however, concedes that Vurgess has standing "to assert the Fourth Amendment." (Doc. 12 at 2.)

added).  Nothing in the language of the amendment suggests that it applies with any less force to a second home used only occasionally than to a citizen's main abode.  Nor is the Court aware of any cases placing such an interpretation upon the amendment.  "[T]he Fourth Amendment has drawn a firm line at the entrance to the house" that may not be crossed without a warrant "[a]bsent exigent circumstances."  <u>Payton</u>, 445 U.S. at 590.  That firm constitutional line creates a protected haven that applies to all homes, including second homes and other dwellings (even tents).  Vurgess testified that he kept his clothes and personal possessions at 807 E. 31st Street, took baths there, and regularly slept there.  The government does not dispute this testimony.  (In fact, it is prosecuting Vurgess for possession of weapons which officers found on the premises.)  Vurgess' privacy interest in a structure that he continued to use as a home was not "greatly diminished" by the fact that he sometimes resided at another home a few blocks down the street.  For all of these reasons, the Court rejects the government's contention that Vurgess' expectation of privacy in

the property, while constitutionally legitimate, was greatly diminished by the manner in which he treated the residence.

The government next argues that Officer Dantzler's entry through the open door of the residence "was motivated by concern for the property owner and the safety of the community" and was made pursuant to a "standard departmental policy." (Doc. 12 at 12.) Thus, the government contends that the "community caretaking function" recognized by the Supreme Court in Cady v. Dombrowski, 413 U.S. 433, 441 (1973), is applicable in this context.

As the government acknowledges, no Eleventh Circuit case has held that the exception to the warrant requirement recognized in Cady (allowing the search of a *vehicle* thought to contain an officer's service revolver, where the officer was comatose and the vehicle was impounded) can be employed to justify the warrantless entry of a home.[16]  But even if there were such authority, the

---

[16] While some courts have extended the community care exception to the warrantless entry of a home, other courts have expressly declined to do so. See, e.g., United States v. Bute, 43 F.3d 531 (10th Cir. 1994). But present in each of the Cady-type residential cases is what is lacking here: some *specific* showing of exigency necessitating immediate police action. Merely coming across a residence with an open door -- absent any other suspicious circumstances -- is simply too slender a reed to support the inference that

government has failed to establish any exigency that required an officer's immediate entry in order to secure the home or protect the community. Officer Dantzler testified that he "made no determination that the community was in danger" and that he had no concern about the safety of the community at the time he entered the residence. (Tr. 46-47.) Nor did he have any specific reason to believe that some crime had occurred at the property or that there was any genuine emergency that necessitated his immediate entry. His sole purpose for entering was to enforce an unwritten police department policy that required officers to check inside a residence any time they discover an open door and receive no response to their knocks. (Tr. 41-46.)

Without an invitation to enter, a police officer may not cross the threshold of a home unless some exception to the warrant requirement applies. These exceptions are "few" and "'jealously and carefully drawn.'" <u>McClish</u>, 483 F.3d at 1240 (citation omitted). The officer who enters through the open door of a residence -- even by simply reaching his arm through the threshold

---

some mischief is afoot. Nor did Officer Dantzler draw any such inference, as he readily conceded.

-- has the burden of proving that his conduct was justified by one of these exceptions. Id. at 1241. Indeed, even the officer with probable cause to believe that evidence of a crime is located inside a residence may not penetrate a home's physical boundary "absent an exigency or consent." Id. at 1242. Officer Dantzler had no one's consent, and he lacked probable cause. Nor has the government pointed to any exigency that required immediate action by the officer. The government, therefore, has not met its burden of demonstrating a recognized justification for stepping across Payton's "firm line."

The fact that Officer Dantzler, in compliance with his training, was following an established police department policy cannot aid the government, for such a policy, however well intentioned, is not "immune from constitutional scrutiny." Payton, 445 U.S. at 600. And as the Georgia Court of Appeals has made clear, such a police policy cannot survive such scrutiny. In State v. Sims, 523 S.E.2d 619 (1999), deputy sheriffs investigating a complaint that a four-wheeler had been driven on a high school ball field located such a vehicle parked in the driveway of a nearby

residence and entered that residence through an open door after no one responded to their knocks. Id. at 620. Although probable cause and exigent circumstances were lacking, the state attorney attempted to justify the entry on the basis of a sheriff department policy that required deputies "to secure any residence with an open door to ensure that a burglary was not in progress." Id. at 621. Despite its skepticism that the sheriff had actually adopted the described policy, the court of appeals had no difficulty concluding that "such a policy, if it exists, violates the Fourth Amendment." Id.

This is clearly a correct interpretation of federal constitutional law. A police officer cannot step across the firm, bright, constitutional line drawn at the threshold of a residence, and thereby intrude into the unquestionable zone of privacy that the Fourth Amendment was designed to protect, just because some established departmental policy instructs him to do so. As the Sims court held, "[t]he police entry into Sim's residence without probable cause or exigent circumstances was a clear violation of the Fourth Amendment." Id. at 622. That holding is equally

applicable here.  The Savannah police department's policy -- which required its officer to intrude through the open door of a residence absent any specific grounds for believing that he was dealing with an emergency situation -- simply cannot be reconciled with established law.  Officer Dantzler's actions, while well intentioned, violated the Fourth Amendment.  Accordingly, all evidence seized as a result of that violation must be suppressed.

## B.    The Second Search

Vurgess argues that it is "incandescently clear" that the second search of his residence was conducted "solely because Cpl. Lopez contacted Mr. Vurgess' probation officer and advised her about the firearm Officer Dantzler discovered during the initial warrantless search."  (Doc. 11 at 6.)  Because the October 3, 2007 search was "tainted" by the illegality of the initial search, Vurgess argues that the government cannot rely on the Fourth Amendment waiver imposed as a condition of his probation to justify the second warrantless entry and search of his premises. The Court finds that Vurgess' "fruit of the poisonous tree" argument is premised on a

mischaracterization of the facts and a misunderstanding of the exclusionary rule.

The exclusionary rule not only prohibits the introduction of the "primary" evidence seized during an unlawful search of a residence, but also requires the suppression of the "derivative" or secondary evidence that is considered tainted because it is "the product of the primary evidence." Murray v. Carter, 487 U.S. 533, 536-37 (1988); see 6 LaFave, Search and Seizure § 11.4(a). Application of the judge-made exclusionary rule, however, "may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." Hudson v. Michigan, 547 U.S. 586, 592 (2006) (noting that "but-for causality is only a necessary, not a sufficient, condition for suppression"); Segura v. United States, 468 U.S. 796, 815 (1984) (the Court "has never held that evidence is the fruit of the poisonous tree simply because it would not have come to light but-for the illegal actions of the police.") (citation and internal quotes omitted). Thus, derivative evidence "acquired as an indirect result of the unlawful search" is excludable only "up to the point at which the connection with the

unlawful search becomes 'so attenuated as to dissipate the taint.'" Murray, 487 U.S. at 537 (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)). Such attenuation can occur "when the causal connection is remote." Hudson, 547 U.S. at 593.

Vurgess suggests that the second search was insufficiently attenuated from the initial unlawful search of his residence because "had the first search never occurred, Cpl. Lopez would not have contacted Mr. Vurgess to inquire about weapons at 807 E. 31st Street, and the police would never have had the 'trigger' to justify the second search." (Doc. 22 at 9-10; doc 11 at 6.) But the evidence adduced at the suppression hearing simply does not support Vurgess' contention that the discovery of the weapon by Officer Dantzler was even the principal -- much less the "sole" -- motivator for Cpl. Lopez or probation officer Caviness. As the record reveals, Cpl. Lopez was primarily interested in the "quality of life" issues raised in Mr. West's e-mails, and Caviness was exclusively focused on verifying the proper address for a person she was supervising. Vurgess has failed to establish that the information which gave rise to these concerns would never have come to light "but for" Officer

Dantzler's discovery of the assault rifle. And even if such but-for causation is present, the causal link between the discovery of the assault rifle and the ultimate discovery of the stolen vehicle parked in front of Vurgess' residence is so remote as to dissipate any possible taint.

Before Cpl. Lopez even became aware of Officer Dantzler's discovery of the weapon inside 807 East 31st Street, he received copies of e-mails that Scott West had forwarded to various city officials and the local news media. Those e-mails raised numerous complaints about the property, including animal abuse by "another Michael Vick in Savannah," poor maintenance of the property, drug trafficking, gun shots, and gang activity. As the community affairs officer responsible for addressing such citizen complaints, Cpl. Lopez organized a team response by various city officials who had little or no interest in following up on any weapon previously found at the residence. The chief action taken by these officials was the seizure of the dogs by animal control on September 7, 2007, and no effort was made to enter the residence on this occasion. Cpl. Lopez spoke with Vurgess later that day about the seizure of

his dogs (and the consequent court proceeding that had been set in motion) and about whether he intended to repair the property. It was during this conversation that Vurgess reported that he was staying at 643 E. 31st Street. During this initial conversation there was no discussion about any weapon having been found on the property. Only later, when Lopez learned that Vurgess was on probation, did he contact probation officer Caviness to advise her that Vurgess might be in violation of his probation conditions. While Caviness was made aware of potential weapons violations, she testified that the "sole reason" she went to visit 643 and 807 E. 31st Street was to nail down where Vurgess was actually residing. It was when she was engaged in this task that Caviness developed good reason to believe that Vurgess had recently parked a stolen vehicle outside 807 E. 31st Street and was hiding inside the residence. She summoned police officers to the scene in order to follow-up on *this* suspected criminal behavior, not to arrest Vurgess for unlawful possession of a weapon.

Vurgess, therefore, is factually mistaken in arguing that knowledge of his possible connection to firearms in the residence

served as a "trigger" for the second entry. The October 3, 2007 entry rested on an entirely different footing. But even if it can be said that the information connecting Vurgess to the stolen vehicle was "derivative" of evidence found during Officer Dantzler's unlawful entry -- and this is quite a stretch, to say the least[17] -- by this point the causal chain had become so long and the connection between the two events so tenuous as "to be purged of the primary taint." <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963). As one commentator has noted,

> "Where the chain between the challenged evidence and the primary illegality is long or the linkage can be shown only by sophisticated argument, exclusion would seem inappropriate. In such a case it is highly unlikely that the police officers foresaw the challenged evidence as a probable product of their illegality; thus it could not have been a motivating force behind it. It follows that the threat of exclusion could not possibly operate as a deterrent in that situation."

6 LaFave, <u>Search and Seizure</u> § 11.4(a) at 260 (citation omitted).

---

[17] It is certainly arguable that Lopez's response to the West e-mails would have independently and inevitably led him to discover that Vurgess was likely in violation of his probation conditions by residing at an address other than that furnished to his probation officer, which would have precipitated the same series of events that led to the discovery of the pistols. It has long been settled that evidence "gained from a source independent of any illegality is not subject to the exclusionary rule." <u>Silverthorne Lumber Co. v. United States</u>, 251 U.S. 385, 392 (1920) (Holmes, J.)

The Supreme Court has rejected the "[i]ndiscriminate application" of the exclusionary rule and has declared that it should be applied only "where its deterrence benefits outweigh its 'substantial social costs.'" Hudson, 126 S. Ct. at 2163 (citations omitted). The "question of attenuation inevitably is largely a matter of degree," Brown v. Illinois, 422 U.S. 590, 609 (1975) (Powell, J., concurring), and the resolution of that question depends upon the facts of each case. LaFave, Search and Seizure § 11.4(a) at 259. Under the particular facts of this case, even if Vurgess has established but-for causality as a necessary predicate to suppression, his effort to link the initial seizure of the rifle with the eventual development of evidence implicating Vurgess to a vehicle theft (and the consequent entry of his residence pursuant to the Fourth Amendment waiver and ultimate discovery of the pistols) is based on such a "sophisticated argument," and such a tenuous connection between the two events, that Officer Dantzler would have needed psychic powers in order to have foreseen such a development. Therefore, exclusion of the later-found evidence would serve no deterrent purpose. In short, the causal connection

between the two events is simply too attenuated to justify exclusion of the evidence seized on October 3, 2007.

## III.  CONCLUSION

"With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no."  <u>Kyllo</u>, 533 U.S. at 31.  The government has offered no recognized exception to the warrant requirement that justifies the initial entry of Vurgess' residence by Officer Dantzler. Although not a full-time occupant of that residence, Vurgess maintained his personal possessions at 807 E. 31st Street, never abandoned that property, and continued to use the premises for at least some domestic purposes.  The officer was not authorized to cross the home's firm boundary line and conduct a search simply because the front door was slightly open and no one was at home to answer his knock.  The assault rifle he discovered during that search must be suppressed.  The second search, however, was justified by the Fourth Amendment waiver Vurgess had made as a condition of his probation and rested on events too attenuated from

the initial illegality to require application of the exclusionary rule. The pistols found during that search are not excludable on Fourth Amendment grounds.

Accordingly, the motion to suppress should be GRANTED in part and DENIED in part.

**SO REPORTED AND RECOMMENDED this  20th  day of August, 2008.**

/s/ G.R. SMITH
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**