UNITED STATES OF AMERICA, )
)
v. )
)
FRANK B. VURGESS, JR., )   CASE NO. CR408-085
)
        Defendant. )
_____)

## O R D E R

Before the Court is the Report and Recommendation of
the Magistrate Judge, to which no objections have been
filed. The Magistrate Judge Recommends that Defendant's
Motion to Suppress (Doc. 11) be granted in part and denied
in part. After a careful de novo review of the record in
this case, The Court concurs with the Magistrate Judge's
Report and Recommendation. Accordingly, Defendant's Motion
to Suppress is **GRANTED IN PART** and **DENIED IN PART**.

### BACKGROUND

On September 3, 2008, Savannah police Officer Michael
Dantzler arrived at 807 East 31st Street in response to a
complaint of animal abuse and dog fighting at the property.
Upon arriving at the property, Officer Dantzler went to the
backyard and found three pit bull puppies housed in a
makeshift chain link kennel. Officer Dantzler observed

that the dogs had food and water, and appeared to be taken care of. Based on his observations, Officer Dantzler did not call out animal control for any further investigation.

Officer Dantzler then approached the front door of the residence with the intention of speaking to the resident. The windows of the home were boarded up and the yard was overgrown. While the home may have appeared to be abandoned, Officer Dantzler recognized the possibility that someone may be living in the home. When Officer Dantzler opened the screen door to knock on the front door of the residence, he noticed that the front door was slightly open. He then both knocked on the front door and called out to anyone who may be located inside the residence.

Receiving no response, Officer Dantzler summoned a backup officer. The two officers, guns drawn, entered the residence with the intention of inspecting each room.[1]

---

[1] Apparently, this action was pursuant to an unwritten departmental policy. Officer Dantzler testified that he was trained to enter a residence, whether it appears to be abandoned or occupied, if the front door of the residence is open and he receives no response from anyone inside the home. He was trained to then inspect each room to make sure that no residents had been harmed and the home had not been burglarized.

Using flashlights due to darkness,[2] the officers walked from room to room, opening the closet doors in each room. During the search, the officers discovered an assault rifle leaning up against a dresser in what appeared to be a bedroom.[3]  Officer Dantzler seized the weapon, which he later logged in to the property room for safekeeping.

After exiting the residence, a twelve-year-old boy approached Officer Dantzler and identified himself as the owner of the three dogs.  Shortly thereafter, three women drove up to the property and informed Officer Dantzler that the property was owned by their recently deceased grandmother.  The women denied any knowledge of the rifle and told Officer Dantzler that it could be destroyed.

Unknown to Officer Dantzler on September 3, 2008, the 807 East 31st Street property had been the subject of numerous prior complaints from neighbors.  These complaints concerned the condition of the property and alleged that dog fighting, animal abuse, drug dealing, gun possession, and gang activity all routinely occurred on the property. On September 6 and 7, 2008, the next door neighbor, Mr.

---

[2] The officers entered the home during daylight hours. However, the interior was dark because of the boarded up windows and lack of electricity to the home.
[3] The room contained a dresser, a mattress and box-spring on the floor, and a laptop computer.

West, wrote lengthy e-mails to the Savannah Police Department complaining of the property's condition and the inadequate police response to complaints of illegal activity occurring on the property. Mr. West also forwarded these e-mails to several police officials, various aldermen, all three Savannah television stations, the local newspaper, and the city manager.

The Police Department forwarded the e-mails to Star Corporal Tony Lopez, a community affairs officer charged with responding to citizen complaints that might require coordination of various police and city services. Due to the nature of the complaints, Corporal Lopez immediately began coordinating efforts among the responsible city services: animal control, property maintenance, and law enforcement.

On September 7, 2008, the assembled group of city officials inspected the 807 East 31st property. The team found the yard and home in the same deteriorated state observed by Officer Dantzler. After finding that the dogs had no water or food, animal control officials removed the dogs from the property and placed them in a shelter. A property maintenance supervisor from the city notified Corporal Lopez that the front door of the residence would

have to be boarded up if the property was abandoned. In addition, the property maintenance supervisor began coordinating efforts to clean up the property. However, Defendant came on the property later in the afternoon and told officials he was in the process of cleaning up the property. In response, the property maintenance supervisor elected not to board up the front door of the residence because the property had not been abandoned. At no point on September 7, 2008 did any official enter the residence located on the property.

Later in the day on September 7, 2008, Corporal Lopez spoke with Defendant via telephone. He explained to Defendant why animal control officers had taken custody of the dogs and that Defendant would be charged with animal neglect. During the conversation, Defendant informed Corporal Lopez that he was staying a 643 East 31st Street while he renovated the 807 East 31st Street property. At no point during the conversation did Corporal Lopez discuss the seized rifle with Defendant.

On September 18, 2007, Corporal Lopez called Defendant to remind him of the approaching court date for the animal neglect charge. During the telephone conversation, Corporal Lopez asked Defendant about the rifle. Defendant

admitted that he had handled the rifle and stated that additional firearms that belonged to his deceased parents were inside the residence. Also, Defendant stated that he and his sister were now the legal owners of the property.

On September 24, 2007, Defendant's probation officer, Brenda Caviness, received a telephone message from an unknown officer[4] informing her that Defendant may have firearms in his residence and Defendant may not be living at 807 East 31st Street. Upon Defendant's release from Chatham County prison, Officer Caviness listed Defendant's residence as 807 East 31st Street. At the time of Defendant's release, Officer Caviness expressly instructed him not to change his residence without permission from his probation officer. On October 3, 2007, Corporal Lopez informed Officer Caviness, via telephone, that ·Defendant admitted handling the rifle, stated that there were additional guns in the residence, and indicated that he was not staying at 807 East 31st Street.

On October 3, 2007, Officer Caviness, concerned about the discrepancy in Defendant's residence, drove past the 807 East 31st Street property. Her initial observation from the vehicle was that the property was uninhabited.

---

[4] The officer's name was incomprehensible on the message.

Even though Defendant had signed a Fourth Amendment waiver, Officer Caviness was reluctant to enter the 807 East 31st Street residence without any indication Defendant was actually residing there. Officer Caviness proceeded to the 643 East 31st Street property in an attempt to verify Defendant's address. The owner of that property informed Officer Caviness that Defendant had been living there, but that he kicked Defendant out approximately one week earlier. After receiving permission from the owner, Officer Caviness examined the room where Defendant slept while residing at 643 East 31st Street. Also, the owner gave Officer Caviness a "Sam's Club" card that Defendant had left behind, which was in the name of Bryan Thomas.

Officer Caviness then proceeded to 807 East 31st Street, where she observed a green Isuzu Trooper parked sideways in the driveway. After receiving no response to her knocks on the door and taps on the boarded windows, Officer Caviness left her business card attached to the screen door. While looking inside the Isuzu, Officer Caviness noticed a beverage cup that still contained ice and was covered in condensation, indicating that the occupant recently arrived to the property and arousing suspicion that someone was inside the residence. In

response, Officer Caviness ran a computer check on the Isuzu's tag. As a result of the computer check, Officer Caviness learned that the vehicle had been reported stolen by its registered owner, Mr. Bryan Thomas—the name on the Sam's Club card recovered from Defendant's room at 643 East 31st Street.

Officer Caviness originally only sought to verify Defendant's correct address.[5] However, it now appeared to her that Defendant may have been involved in the theft of the vehicle. While waiting for additional officers, neighbors informed Officer Caviness that the driver of the Isuzu had entered the residence at 807 East 31st Street and had not come out. Once the additional officers arrived, the Police entered the residence by breaking a small pane of glass and unlocking the front door. Defendant immediately surrendered to the officers. A search of the residence uncovered two pistols.

Defendant was indicted on two counts of possession of a firearm. The first count stems from the seizure of the assault rifle on September 3, 2007. The second count is based on the two pistols recovered by police following the

_____

[5] Officer Caviness testified that her only reason for going to either address on October 3, 2007 was to determine where Defendant was actually residing.

October 3, 2007 search. Defendant filed a motion to suppress all of the weapons seized from the residence. (Doc. 11.) In his motion, Defendant argues that the discovery of the rifle on September 3, 2007 was the result of an illegal warrantless search. Also, Defendant argues that the two pistols discovered on October 3, 2007 were the result of the previous illegal search and should be suppressed as fruit of the poisonous tree.

## ANALYSIS

### A.    The September 3, 2007 Search

It is a "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980); see also Katz v. United States, 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.") Physical entry into an individual's home "is the chief evil against which the wording of the Fourth Amendment is directed." United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1917). In fact, nowhere else do the protections guaranteed by the

Fourth Amendment mean more to an individual that when the government performs a warrantless search of her home. See Bates v. Harvey, 518 F.3d 1233, 1243 (11th Cir. 2008) ("The 'centuries-old principle of respect for the privacy of the home' is the fountainhead of our Fourth Amendment protections." (quoting Wilson v. Layne, 526 U.S. 603, 610 (1999))). It is for that reason that courts place the burden on the government to show that a warrantless search of a home meets a recognized exception. See Mincey v. Arizona, 437 U.S. 385, 390—91 (1978).

The Supreme Court has consistently identified an individual's interest in preserving the privacy and sanctity of her home. While the Supreme Court generally resists creating bright-line rules in regards to the Fourth Amendment, the importance of an individual's privacy in her home has led the Supreme Court to draw a firm line at the entrance and physical dimensions of the home. Payton, 445 U.S. at 589—90. The Court has noted that the line demarking the boundaries of a home "must be not only firm but also bright." Kyllo v. United States, 533 U.S. 27, 40 (2001); see also McClish v. Nugent, 483 F.3d 1231, 1242—43 (11th Cir. 2007) (listing cases applying firm constitutional line drawn at the entrance of the home).

Therefore, any government agent who, without a warrant, breaks the boundary of a home, if even by a fraction, "bears the burden of proving that his conduct was justified" by the exigency of the circumstances. McClish, 483 F.3d at 1241.

The Government argues that Officer Dantzler had probable cause to enter the home. (Doc. 12 at 8.) However, the Government must still show that the warrantless search was justified by exigent circumstances. The Supreme Court has clearly stated that "only in 'a few specifically established and well-delineated' situations may a warrantless search of a dwelling withstand constitutional scrutiny, even though the authorities have probable cause to conduct it." Vale v. Louisiana 399 U.S. 30, 34 (1972) (quoting Katz, 389 U.S. at 357). Therefore, the fact that probable cause existed that could have formed the basis for a valid warrant can never justify the warrantless search of a home. Accordingly, the Government's argument is without merit.

The Government also argues that the warrantless entry was justified by the exigency of the circumstances. In support of its argument, the Government cites the condition and appearance of the property, and its location in a high

crime neighborhood, as creating a sufficient danger to the community to justify a warrantless entry in the home. This argument fails for two reasons. First, the Fourth Amendment would be rendered a virtual nullity if government agents could perform warrantless searches based merely on the location of a home and its unkempt appearance. Assuming that the property was in a state of disrepair and located in a high crime neighborhood, the government has failed to show that this created any specific emergency that would justify abandoning the warrant requirement.[6] Such a ruling would strip a large segment of the population of their Fourth Amendment protection simply because they have the misfortune of living in a high crime area and a disdain for performing work in the yard or on their house. In regards to the warrantless entry into an individual's home, the touchstone of Fourth Amendment protection is not the aesthetic quality of the property. This would place the applicability of an important constitutional protection in

---

[6] While the Government, in a conclusory manner, posits that failing to enter the home would have endangered the community, property owner, and other law enforcement officers, it fails to provide any examples of the danger posed by the property that would necessitate an immediate entry into the home.

the eye of the beholder and remove crucial safeguards that operate to preserve our individual liberties.

Second, Officer Dantzler testified that, at the time he entered the home, he had no reason to suspect that the community was faced with imminent danger. In addition, Officer Dantzler had no reason to believe that a crime had been committed on the property or that there was any other emergency that required immediate entry into the home. In fact, Officer Dantzler testified that the only reason he entered the home was the unwritten departmental policy that required officers to check inside a residence if they discover an open door and fail to receive any response to their knocks.[7] Based on this testimony, it is clear to the Court that the warrantless entry into the home was not necessitated by the exigency of the circumstances.[8]

In an attempt to remove all Fourth Amendment Protection from the home, the Government attempts to

[7] The Georgia Court of Appeals has already ruled that a similar policy violates the Fourth Amendment. See State v. Sims, 240 Ga. App. 391, 392, 523 S.E.2d 619, 621 (1999) (declaring unconstitutional a policy requiring police officers "to secure any residence with an open door to ensure that a burglary was not in progress").

[8] The Government also argues that the entry was justified as a community caretaking exception recognized in Cady v. Dombrowski, 413 U.S. 433, 441 (1973). However, the Government's argument fails for the same reasons that prevent it from establishing exigent circumstances.

justify the warrantless entry by arguing that Defendant had
no reasonable expectation of privacy in the residence.  In
making this argument, the Government reasons that the poor
condition of the property, the fact that Defendant did not
live in the home, and Defendant's failure to secure and
lock his front door combined to greatly diminish
Defendant's expectation of privacy.  Regardless of the
condition of the property, however, Defendant still had a
reasonable expectation of privacy that would merit Fourth
Amendment protections.

     As noted above, the sanctity of the home is a
jealously guarded constitutional protection—one that cannot
be diminished by a subjective assessment of the quality of
the dwelling.  The poor condition of a home is of no
constitutional significance. [9]  The protections of the
Fourth Amendment derive from an individual's desire to

---

[9] In <u>Miller v. United States</u>, the Court quoted a 1763 speech
from William Pitt, Earl of Chatham:

     The poorest man may in his cottage bid defiance
     to all the forces of the Crown. It may be frail;
     its roof may shake; the wind may blow through it;
     the storm may enter; the rain may enter; but the
     King of England cannot enter—all his force dares
     not cross the threshold of the ruined tenement!

357 U.S. 301, 307 (1958) (quoting The Oxford Dictionary of
Quotations 379 (2d ed. 1953)).

carry of private activities away from the public eye. It is this desire that makes an individual's dwelling, regardless of its condition, worthy of Fourth Amendment protection. Surely the condition of an individual's property, a highly subjective determination at best, is not enough to offset "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." Payton, 445 U.S. at 601. If each home truly is the owner's castle, id. at 596, 597—98, it is not the condition of the walls that matter but rather that behind them the owner "harbors those intimate activities associated with domestic life and the privacies of the home." United States v. Dunn, 480 U.S. 294, 301 (1987).

The Government suggests that the general state of the property led Officer Dantzler to reason that the house had been abandoned. However, Officer Dantzler stated that he never concluded that the property had been abandoned. In fact, Officer Dantzler knocked on the front door to see if anyone was home, not to determine if anyone lived on the property. Nor would it have been reasonable for Officer Dantzler to make that conclusion based on the condition of the property. The home was not in such a condition that

would preclude those inside from engaging in the "'the privacies of life'". Oliver v. United States, 466 U.S. 170, 180 (1984) (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)). For example, the 11th Circuit has previously ruled that even a home that has been ravaged by fire cannot be searched without a warrant absent some exigency. United States v. Parr, 716 F.2d 796, 810 (11th Cir. 1983). If the Fourth Amendment protects the fire and water damaged home, surely it also extends to one with four walls, a roof, and a front door, even if the windows have been boarded up.

The Government attempts to argue that Defendant had no privacy interest in the home because he had been living at 643 East 31st Street. However, this argument is unavailing. The hallmark of Fourth Amendment protection is whether the resident "harbors those intimate activities associated with domestic life and the privacies of the home" in the structure. Dunn, 480 U.S. at 301. The evidence shows that Defendant maintained a bed, kept personal items, bathed, and occasionally slept at 807 East 31st Street. The property need not have been Defendant's full time residence to be protected by the Fourth Amendment. Otherwise, no individual would have Fourth

Amendment protections while in a hotel room, Stoner v. California, 376 U.S. 483 (1964), or visiting a friend, Jones v. United States, 362 U.S. 257 (1960). See Hoffa v. United States, 385 U.S. 293, 301 (1966) ("What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile." (emphasis added)).

In short, the Government has failed to show either that Defendant lacked any Fourth Amendment protection in the 807 East 31st Street property, or that Officer Dantzler's actions were necessitated by the exigency of the circumstances. Therefore, Officer Dantlzer's actions violated the Fourth Amendment and all evidence seized as a result of the September 3, 2007 search must be suppressed.

**B.    The October 3, 2007 Search**

Defendant argues that all evidence seized from the October 3, 2007 search must suppressed as "fruit of the poisonous tree." (Doc. 11.) He reasons that the second search is tainted because Corporal Lopez contacted Defendant's probation officer and informed her of the weapon found during the earlier search. For the following reasons, this Court finds that the weapons seized during

the second search were not the result of the prior
unconstitutional search.

The exclusionary rule prohibits the introduction of
any evidence seized during an unlawful search. Murray v.
Carter, 487 U.S. 533, 536–37 (1988). In addition, courts
must suppress any evidence that is the product of the prior
unconstitutional search. Id. However, evidence is not the
product of an unconstitutional search simply because the
constitutional violation was a "but-for" cause of obtaining
the evidence. Hudson v. Michigan, 547 U.S. 586, 592
(2006), Segura v. United States, 468 U.S. 796, 815 (1984).
Accordingly, the United States Supreme Court has recognized
three main exceptions to the fruit of the poisonous tree
doctrine. First, tainted evidence is admissible if
knowledge of it is gained from an independent source."
Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392
(1920). Second, the exclusionary rule will not bar
evidence where "the prosecution can establish by a
preponderance of the evidence that the information
ultimately or inevitably would have been discovered by
lawful means." Nix v. Williams, 467 U.S. 431, 443 (1984).
Finally, evidence obtained based on a prior
unconstitutional search may be admissible if the connection

between the illegal search and the evidence has "become so attenuated as to dissipate the taint." Nardone v. United States, 308 U.S. 388, 341 (1939). Based on the circumstances surrounding Officer Caviness's involvement, this Court finds that evidence seized in the second search is admissible because it was discovered by a source independent of the illegal search, and its discovery is too attenuated from the constitutional violation to warrant exclusion.

The general principle behind the independent source rule is that the police should not be put in a worse position simply because of a prior constitutional violation. Nix v. Williams, 467 U.S. 431, 433 (1984). "'When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position that they would have been in absent any error or violation.'" Murray, 487 U.S. at 537 (quoting Nix, 467 U.S. 443). Therefore, "evidence acquired in a fashion untainted by the illegal evidence-gathering activity" is not subject to the exclusionary rule. Id. at 537–38.

Here, the evidence seized during the second search was obtained through an independent source. Mr. West, Defendant's neighbor, filed several complaints concerning

the 807 East 31st Street property. In particular, Mr.
West's September 6, 2007 email gave Corporal Lopez a reason
to inspect the property independent of the September 3,
2007 search. As part of determining whether the property
was abandoned, Corporal Lopez would likely have discovered
that Defendant was living on the property. From here, it
is only a short step to reason that Corporal Lopez would
have discovered that Defendant was a probationer, and that
the Defendant was not living at the address he provided the
probation office. From this point, Corporal Lopez would
have notified Officer Caviness and the discovery of the
pistols would have occurred.

In fact, this "hypothetical" is not too far afield
from the actual events. Corporal Lopez never even
mentioned the rifle during his September 7, 2008
conversation with Defendant, where he learned that
Defendant was living at 643 East 31st Street. The only
change from the hypothetical is that Corporal Lopez later
learned of the rifle, and passed that information along to
Officer Caviness. However, this does not serve to transfer
the taint of the illegal search to Officer Caviness's
investigation. She testified that her only purpose for
visiting the 807 East 31st Street property was to verify

Defendant's address. Accordingly, Officer Caviness did not even seek to enter the residence until her suspicion was aroused due to the stolen vehicle parked in the driveway. As noted above, Officer Caviness first drove by t807 East 31st Street and visited the 643 East 31st Street property. After the owner notified her that Defendant no longer resided at that address, she visited the 807 East 31st Street property. Officer Caviness knocked on the door and did not attempt to enter to residence when she received no response, leaving her calling card attached to the screen door. It was only after she learned that the vehicle was stolen, and that the driver was likely still inside the residence, did she enter the home, which led to the discovery of the pistols. Therefore, the pistols should not be suppressed because they were discovered by an independent investigation that did not rely on any evidence obtained in the prior unconstitutional search.

Furthermore, the exclusionary rule is not applicable because the October 3, 2007 search was sufficiently attenuated from the initial unlawful search. "Attenuation can occur . . . when the causal connection is remote." Hudson v. Michigan, 547 U.S. 586, 593 (2006). Defendant argues that the initial unlawful search is the trigger that

justified the second search. However, "but-for causality is only a necessary, not a sufficient, condition for suppression" of evidence, Hudson, 547 U.S. at 592, and the reasons for the second investigation serve to sufficiently attenuate the second search from the first.

Neither Corporal Lopez nor Officer Caviness investigated the property solely because Officer Dantzler found the rifle during the initial search. As noted above, Corporal Lopez was responding to several complaints concerning the 807 East 31st Street property. His investigation on September 7, 2007 was not to search for suspected weapons in the residence, but to address the complaints of animal abuse, poor property maintenance, drug trafficking, gun shots, and gang activity. At no point during his visit to the property did Corporal Lopez, or any other government agent, attempt to enter the residence. Furthermore, he never even mentioned the rifle to Defendant during their phone conversation on September 7, 2008. Only later, when Corporal Lopez learned that Defendant was on probation, did he contact Officer Caviness to inform her that Defendant may be in violation of his probation by residing at the incorrect address and handling firearms.

At this point, Officer Caviness's investigation was prompted <u>solely</u> by a desire to verify Defendant's correct address, not to search for weapons. She initially drove past the 807 East 31st Street property to the address Defendant provided Corporal Lopez—643 East 31st Street. Upon learning Defendant no longer resided at 643 East 31st Street, Officer Caviness returned to the 807 East 31st Street property. Even at this point, she did not attempt to enter the residence, but knocked and, after receiving no response, left her calling card attached to the screen door. It was not until Officer Caviness learned both that the vehicle parked in the driveway was reported stolen, and that the driver was likely still inside the residence, did she decide to enter the home, which resulted in the seizure of the pistols. By this point, the causal chain has become so long and the connection between the two searches so tenuous as "to be purged of the primary taint." <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963). Therefore, this Court declines to suppress the pistols discovered in the second search as fruits of the poisonous tree because the causal connection between the two searches in simply too attenuated to justify exclusion.

## CONCLUSION

After careful consideration, Defendants Motion to Suppress is **GRANTED IN PART** and **DENIED IN PART**. Accordingly, the rifle seized during the September 3, 2007 search is **SUPRESSED** and the pistols seized during the October 3, 2007 search are **ADMISSIBLE**.

SO ORDERED this *26th* day of September, 2008.


WILLIAM T. MOORE, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA